PREET BHARARA
United States Attorney for
the Southern District of New York
By: CHRISTINE I. MAGDO
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2297
E-mail: christine.magdo@usdoj.gov

JUDGE SCHOFIELD

14 CV 9820

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

                Plaintiff,        :

        - v. -                          :

ALL RIGHT, TITLE AND INTEREST IN THE         :
ASSETS OF GOURMET BOUTIQUE OF NY
LLC, LOCATED AT 3684-88 NOSTRAND             :
AVENUE, BROOKLYN, NEW YORK, AND A
51% INTEREST IN THE ASSETS OF MR.            :
CONEY ISLAND LLC, INCLUDING BUT NOT
LIMITED TO 40% OF THE NET PROFITS OF         :
GRIMALDI'S PIZZERIA, LOCATED AT
1215 SURF AVENUE, BROOKLYN, NEW              :
YORK,

                          :

and all property traceable thereto,          :

           Defendants in rem.         :

- - - - - - - - - - - - - - - - - x

**VERIFIED COMPLAINT**

14 Civ.

ECF Case



        Plaintiff United States of America, by its attorney, Preet

Bharara, United States Attorney for the Southern District of New

York, for its verified complaint alleges, upon information and

belief, as follows:

1.     This action is brought by the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A), seeking the forfeiture of Gourmet Boutique of NY LLC, a retail grocery business located at 3684-88 Nostrand Avenue, Brooklyn, New York ("Gourmet Boutique") and a 51% interest in Mr. Coney Island, LLC, (the "Mr. Coney Island Majority Interest"), including but not limited to its 40% interest in the net profits of Grimaldi's Pizzeria, located at 1215 Surf Avenue, Brooklyn, New York (Gourmet Boutique and the Mr. Coney Island Majority Interest, together, the "Defendants in rem").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to Title 28, United States Code, Section 1355(b)(1), which provides that a forfeiture action or proceeding may be brought in the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred.

3.     Venue is proper pursuant to Title 28, United States Code, Section 1395(a) because the cause of action accrued in the Southern District of New York.

## FACTUAL BACKGROUND

### Overview

4.     Originally created in or about 2002 in Brooklyn, New York, and eventually moved offshore to Costa Rica in or about 2009,

2

Liberty Reserve S.A. ("Liberty Reserve") operated one of the world's most widely used digital currencies until 2013, when it was indicted for money laundering and operating an unlicensed money transmitting business.

5.    Arthur Budovsky ("Budovsky"), the principal founder of Liberty Reserve, directed and supervised Liberty Reserve's operations, finances, and corporate strategy.  Mark Marmilev ("Marmilev") began working for Budovsky in or about 2003, designing and maintaining Liberty Reserve's website, among other things.  Over time, Marmilev played an increasingly important role in operating Liberty Reserve, becoming, in essence, its Chief Technology Officer, responsible for overseeing its online and technical infrastructure. By 2010, Budovsky gave Marmilev a thirty-percent ownership share of Liberty Reserve.

6.    As detailed below, Marmilev and Budovsky used approximately $1.6 million of illegally-derived proceeds from the operation of Liberty Reserve to purchase the Defendants in Rem.   In addition, Marmilev and Budovsky laundered a portion of the proceeds of the operation of Liberty Reserve through the operation of Gourmet Boutique.   For example, Marmilev, Marmilev's wife, and Budovsky's parents received salaries from Gourmet Boutique, effectively laundering the investment of illegally derived proceeds into seemingly legitimate salaries.

3

How Liberty Reserve Functioned

7.    Through its website, www.libertyreserve.com,
Liberty Reserve provided its users with what it described as
"instant, real-time currency for international commerce," which
could be used to "send and receive payments from anyone, anywhere
on the globe."  Liberty Reserve also touted itself as the Internet's
"largest payment processor and money transfer system," serving
"millions" of people around the world, including hundreds of
thousands of users in the United States.  To use the Liberty Reserve
digital currency, commonly referred to as "LR," a user first needed
to open an account through the Liberty Reserve website.  In
registering, the user was required to provide basic identifying
information, such as name, address, and date of birth.

8.    However, unlike mainstream banks or online payment
processors, Liberty Reserve did not require users to validate their
identity information when opening an account.  As a result, an
individual could easily open a Liberty Reserve account using identity
information that was fabricated or stolen.  In fact, users commonly
established Liberty Reserve accounts under blatantly fictitious
names, often using names signaling the users were involved in
criminal activity.

9.    Once a user established an account with Liberty
Reserve, the user could then conduct LR transactions with other

4

Liberty Reserve users through the Liberty Reserve website.  That is, the user could receive transfers of LR from other Liberty Reserve accounts, and could likewise transfer LR from his own account to other users' Liberty Reserve accounts.

10.  However, unlike with mainstream banks or online payment processors, a Liberty Reserve user could not fund his account by transferring money to Liberty Reserve directly.  Nor could a Liberty Reserve user withdraw funds from his account directly. Instead, Liberty Reserve users were required to purchase and redeem LR by using third-party "exchangers."  These exchangers were individuals or entities separate from Liberty Reserve who maintained direct financial relationships with Liberty Reserve, buying and selling LR in bulk from Liberty Reserve in exchange for mainstream currency.  The exchangers in turn would buy and sell this LR in smaller transactions with end users in exchange for mainstream currency.

11.  In order to fund a Liberty Reserve account, a Liberty Reserve user was required to transmit mainstream currency to an exchanger of the user's choosing.  Upon receiving the user's payment, the exchanger credited the user's Liberty Reserve account with a corresponding amount of LR, by transferring LR from the exchanger's Liberty Reserve account to the user's Liberty Reserve account.  If a Liberty Reserve user wished to withdraw funds from

his account, the user was required to transfer LR from his Liberty Reserve account to an exchanger's Liberty Reserve account, and the exchanger then would make arrangements to send the user a corresponding amount of mainstream currency.

12.   Liberty Reserve had millions of user accounts and processed billions of dollars in user transactions.  According to data obtained from the company's computer servers, which were seized during the Government's investigation, Liberty Reserve had approximately 5.1 million user accounts as of May 2013.  The total volume of transactions for all 5.1 million accounts reflected in the data (including payments sent and received from each account) is approximately $16.4 billion.

13.   The Liberty Reserve transactional data also reflect transactions with accounts registered as "exchanger" accounts with Liberty Reserve.  These were Liberty Reserve users that were designated on Liberty Reserve's system as exchangers authorized to convert users' real currency to LR and vice-versa.  (Many "underground" exchangers also operated on Liberty Reserve but were not designated as exchanger accounts on its system.)  The data for these exchanger accounts reflect outgoing transfers of LR to U.S.-based users totaling approximately $114 million.  These transfers correspond with purchases of LR by U.S.-based users in exchange for real currency.  The data for the exchanger accounts

likewise reflect incoming transfers of LR from U.S.-based users totaling approximately $95 million, corresponding with cashouts of LR by U.S.-based users through these exchangers.   In short, the total amount of money transferred in and out of the Liberty Reserve system by U.S.-based users, through designated Liberty Reserve exchangers, was approximately $209 million.

14.   Liberty Reserve used an Australian-based company called Technocash Limited ("Technocash") to receive funds from exchangers.   According to the Technocash website, Technocash specialized in business-to-business international transfers of funds.   Technocash itself was not a financial institution, but rather had bank accounts located at Westpac Bank Corporation ("Westpac Bank") in Australia.   Budovsky used nominees to sign up for accounts with Technocash.   Liberty Reserve employees instructed exchangers wishing to purchase LR currency to wire funds to the nominee Liberty Reserve accounts at Technocash.   When exchangers sent money to Liberty Reserve through Technocash, the money would be deposited, by Technocash, into accounts at Westpac and Technocash would credit the Liberty Reserve-controlled account at Technocash. Budovsky had access to the Technocash accounts via the Technocash website where he could view past transactions, view the balance, and wire funds to other Technocash accounts or order wires to accounts held at any account for which he had the account information.   In

the period from June 12, 2012 to May 1, 2013, exchangers sent approximately $36,919,884 to Liberty Reserve through Technocash. Technocash deposited funds received from exchangers for the benefit of Liberty Reserve into twelve accounts that Technocash held at Westpac Bank (the "Technocash Accounts").

<u>The Criminal Use of Liberty Reserve</u>

15.   Budovsky, Marmilev, and their co-conspirators intentionally created, structured, and operated Liberty Reserve as a criminal business venture, one designed to help criminals conduct illegal transactions and launder the proceeds of their crimes. Liberty Reserve was designed to attract and maintain a customer base of criminals by, among other things, enabling users to conduct anonymous and untraceable financial transactions.

16.   Liberty Reserve emerged as one of the principal means by which cyber-criminals around the world distributed, stored, and laundered the proceeds of their illegal activity.  Indeed, Liberty Reserve became a financial hub of the cyber-crime world, facilitating a broad range of online criminal activity, including credit card fraud, identity theft, investment fraud, and computer hacking.

17.   The Government's investigation uncovered a wide variety of evidence reflecting the extensive use of Liberty Reserve by criminal users – in particular, criminal websites or online schemes that used Liberty Reserve to receive payments from their

customers or victims or to launder the proceeds of their illegal enterprises.  By contrast, the Government's investigation uncovered no evidence of substantial use of Liberty Reserve by legitimate, mainstream online businesses (such as Amazon.com or other online shopping venues).

18.   Liberty Reserve offered online "merchants" using its services the ability to access Liberty Reserve through a shopping cart interface ("SCI").  In this way, the "merchants" could accept Liberty Reserve payments from customers directly on their own websites, without requiring the customers to log on separately to Liberty Reserve (just as many mainstream online merchants accept payments through Paypal).  Of the top ten websites that referred traffic to Liberty Reserve's SCI interface from 2007 to 2013 (in terms of volume of referrals), half of the sites were "carding" websites, i.e. websites engaged in trafficking stolen credit card data and related illegal goods and services.  In addition, Liberty Reserve received user traffic from hundreds of other carding websites – including 834 websites with domain names containing the word "card," such as "carder007.net" and "cardshop.tv" – and 487 other websites with domain names containing "cvv" such as "cvvshop.su" and "freshcvv.cc."

19.   Further, analysis of the top approximately 500 Liberty Reserve accounts by transaction volume, i.e. funds sent and

received, indicates that a substantial amount of the activity in the Liberty Reserve system can be traced back to likely criminal activity.  The total transaction volume for these accounts is approximately $7.2 billion, or 44% of the total volume of transactions on Liberty Reserve's entire system.  Of these top approximately 500 accounts, 117 of the accounts, accounting for approximately $1.4 billion in transactions, were associated with online Ponzi schemes known as "high yield investment programs" or "HYIPs."  Another 73, accounting for approximately $1.2 billion in transactions, were associated with unregulated "forex" (foreign currency trading) websites, and 32, accounting for approximately $210 million in transactions, were associated with trafficking in stolen credit card information.  Most of the remaining accounts in the top 500 belonged to Liberty Reserve exchangers.

Marmilev's Knowledge of the Illegal Nature
of Liberty Reserve's Business

20.  Marmilev was aware that Liberty Reserve's services were being used to process transactions for websites engaged in criminal activity, or he at least consciously avoided confirming the nature of websites using Liberty Reserve that were engaged in activity he knew was highly likely to be criminal.

21.  As the person responsible for maintaining Liberty Reserve's technological infrastructure, Marmilev had unfettered

10

access to all of the data on Liberty Reserve's transactional system – including the data described above clearly reflecting use of the system by criminal websites.  Marmilev was also able to view the referral data of the sort described above, detailing the sources of traffic directed to Liberty Reserve's shopping cart interface. Indeed, extensive Liberty Reserve user data was found on Marmilev's laptop computer, which was searched during a border stop of Marmilev in early 2012.  Thus, it was easily within Marmilev's grasp to inquire into the nature of the users of Liberty Reserve's system. And even with the limited data that Liberty Reserve collected about those users, it should have been obvious that many of the websites that accepted Liberty Reserve as payment were criminal in nature.

### Liberty Reserve Did Not Register as a Money Transmitting Business under Federal Law

22.  Under Title 18, United States Code, Section 1960, it is a felony to conduct a "money transmitting business" if, among other things, the business is not registered as a money transmitting business with the Secretary of the Treasury as required under Title 31, United States Code, Section 5330 or regulations prescribed thereunder, or if the business otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote

unlawful activity.  See 31 C.F.R. §§ 1010.100(ff)(5), 1022.380(a)(2).

23.  The implementing regulations for Title 31, United States Code, Section 5330 specifically apply to foreign-based money transmitting businesses doing substantial business in the United States.  As noted above, at least 600,000 Liberty Reserve accounts, which engaged in more than $2 billion in transactions on Liberty Reserve's system, are associated with users who reported their country of origin as the United States.   Notwithstanding that Liberty Reserve thus did substantial business with customers in the United States, at no time did the company ever register with the United States Department of Treasury as a money transmitting business.

## THE RELATED CRIMINAL CASE

24.  On May 20, 2013, a grand jury in the Southern District of New York returned a sealed indictment charging Liberty Reserve, Budovsky, Marmilev, and six other principals of Liberty Reserve with conspiracy to commit money laundering, in violation of 18 U.S.C. 1956(h) (Count One); conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371 (Count 2); and operation of an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960 and 2 (Count Three).  See United States v. Liberty Reserve, et al., 13 Cr. 368 (DLC) (the "Indictment").  The

Indictment alleges, among other things, that the defendants operated an international online digital currency service and money transfer system through the website www.libertyreserve.com that was designed to attract and maintain a customer base of criminals and, in fact, became the online service preferred by cyber-criminals around the world for distributing, storing, and laundering the proceeds of their criminal activity, in violation of 18 U.S.C. § 1956(h).  The Indictment further charges that by operating the Liberty Reserve website, the defendants operated, and engaged in a conspiracy to operate, an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960, 371, and 2.

25.  On or about May 21, 2013, the United States obtained a seizure warrant for up to $36,919,884 on deposit in the accounts that Technocash held for the benefit of Liberty Reserve at Westpac Bank (the "Technocash Accounts").  The basis for the seizure of the funds in the Technocash Accounts was a finding of probable case that the funds were property involved in money laundering, or traceable to such property, and therefore subject to civil forfeiture pursuant to 18 U.S.C. § 981.

26.  On or about May 24, 2013, Budovsky, Marmilev, and three of their co-defendants were arrested on the charges in the Indictment.  Budovsky has pled not guilty, and his trial is scheduled to begin on September 21, 2015.

27.   On or about September 11, 2014, Marmilev pled guilty to Count Two of the Indictment.  More specifically, Marmilev pled guilty to conspiring to operate an unlicensed money transmitting business as defined in 18 U.S.C. §§ 1960(b)(1)(B) and (b)(1)(C), in violation of Title 18, United States Code, Section 371.  In connection with his plea, Marmilev admitted that Liberty Reserve failed to register with the U.S. Secretary of the Treasury, that the value of the funds involved in the offense was greater than $200 million but less than $400 million, and that he believed that a substantial amount of funds from the United States moving through Liberty Reserve came from high yield investment programs that he believed had a high probability of being fraudulent but that he consciously avoided obtaining confirmation of that fact.

### THE PURCHASE AND OPERATION OF GOURMET BOUTIQUE WITH THE PROCEEDS OF LIBERTY RESERVE

28.   Prior to the court-ordered restraint of the Technocash Accounts in May 2013, Budovsky and Marmilev used funds from the Technocash Accounts to purchase, renovate and operate a grocery store in Brooklyn called Gourmet Boutique.

29.   On or about July 2, 2009, Gourmet Boutique signed an Assignment and Assumption of Lease for the premises located at 3684-88 Nostrand Avenue, Brooklyn, New York (the "Assignment and Assumption of Lease"), and Gourmet Boutique purchased the grocery

14

business located at 3684-88 Nostrand Avenue from its prior owner for $420,000, via a Contract for Sale of Business (the "Contract for Sale of Business"). A $65,000 down payment was made, and a promissory note between the prior owner and Gourmet Boutique for $355,000 was executed (the "Promissory Note").   The promissory note was guaranteed by two individuals with the initials R.S. and A.K.   On or about July 13, 2009, a U.S. bank account in the name of Gourmet Boutique was opened (the "Gourmet Boutique Account") and the signers on the account were R.S. and A.K.

30.   On or about October 23, 2009, Marmilev sent Budovsky an email attaching the Assignment and Assumption of Lease, the Contract for Sale of Business, and the Promissory Note.

31.   On or about November 2, 2009, Marmilev sent Budovsky an email with a spreadsheet showing monthly expenses and revenue for Gourmet Boutique.   The spreadsheet included a column entitled "Our Total Investment," which listed $100,000 for purchase of 50% shares, $91,500 for equipment, $150,000 to the previous owner, and $50,000 in operating cash.   The spreadsheet also stated, in part, that Gourmet Boutique was not profitable because it lacked refrigerators or freezers for buying large quantities at a discount, and had insufficient funds to purchase large volumes of inventory.

32.   On or about November 26, 2009, Marmilev sent Budovsky an email providing information regarding A.K.'s bank account.

15

According to the email, $110,000 would be wired to A.K. for the "purchase of shares," and $100,000 would be wired to the Gourmet Boutique Account as "part of loan."

33.   On or about November 30, 2009, a wire transfer in the amount of $99,975 was made from the Technocash Accounts to the Gourmet Boutique Account.   The memo line states: "Contract 2009-11-G Loan Payment 1."

34.   On or about December 1, 2009, a wire transfer in the amount of $110,000 was made from the Technocash Accounts to A.K.'s bank account.

35.   On or about December 8, 2009, a wire transfer in the amount of $49,975 was made from the Technocash Accounts to the Gourmet Boutique Account.   The memo states: "Produce Purchase Allowance PO 0902-11."

36.   On or about December 8, 2009, Marmilev sent Budovsky an email stating, in relevant part, "For store equipment.   30% deposit.   Amount: $100k. Memo: gourmet boutique equipment deposit." In the email, Marmilev also provided the name of the restaurant equipment vendor (the "restaurant equipment vendor") and information about the vendor's account at a bank in the Bronx, New York.

37.   On or about December 11, 2009, a wire transfer in the amount of $100,000 was made from the Technocash Accounts to the restaurant equipment vendor's bank account.   On or about March 16,

16

2010, two additional wire transfers, totaling $165,000, were made from the Technocash Accounts to the restaurant equipment's vendor bank account.

38.   On or about December 17, 2009, a wire transfer in the amount of $199,975 was made from one of the Technocash Accounts to the Gourmet Boutique Account.  The memo states: "Business Loan 12 15 2009."

39.   On or about January 29, 2010, a wire transfer in the amount of $199,975 was made from the Technocash Accounts to the Gourmet Boutique Account.  The memo states: "Business Loan January 2010 Paymentequipment [sic] Produce."

40.   On or about March 19, 2010, a wire transfer in the amount of $199,975 was made from the Technocash Accounts to the Gourmet Boutique Account.  The memo states: "Inventory Fullfilment [sic] Loan 03-10."

41.   On or about April 1, 2010, a wire transfer in the amount of $88,375 was made from the Technocash Accounts to the Gourmet Boutique Account. The memo states: "Inventory Purchase Loan."

42.   On or about April 26, 2010, Marmilev deposited $23,850 in cash into the Gourmet Boutique Account.

43.   On or about September 1, 2010, Marmilev was added as a signer on the Gourmet Boutique Account, along with R.S; each was listed as a "member."   A.K. was removed as a signer on the account.

44.   On or about September 20, 2010, a wire transfer in the amount of $99,975 was made from the Technocash Accounts to the Gourmet Boutique Account.   The memo states: "Container Purchase Loan 1 Year Termsent [sic] by WWW Technocash Com."

45.   The total amount of money that was sent from the Technocash Accounts, located at Westpac Bank in Australia, to the U.S. bank accounts of Gourmet Boutique, A.K., and the restaurant equipment vendor for the purchase, renovation, and operation of Gourmet Boutique was $1,313,275.

46.   Although many of the memo lines associated with the transfers from the Technocash Accounts contain the word "loan," upon information and belief, to date, there have been no repayments made on any of these purported "loans."   Specifically, a witness has stated that Gourmet Boutique has not made repayments on the "loans." The Gourmet Boutique accounting documents show the amounts received from Technocash and payable to the restaurant equipment vendor were recorded as "loans payable."   The accounting documents show no repayments on the loans payable.

47.   From on or about April 26, 2010 through on or about August 23, 2012, Marmilev personally deposited more than $2.1 million in cash into the Gourmet Boutique Bank Account.

## THE LAUNDERING OF THE PROCEEDS OF
## LIBERTY RESERVE THROUGH GOURMET BOUTIQUE

48.  On or about May 24, 2013, a search warrant was executed at the premises of Gourmet Boutique, including the office that Marmilev maintained there.   A notebook containing what appears to be Gourmet Boutique's payroll ledger book was recovered.   The ledger indicates that Gourmet Boutique paid approximately $2,000 in cash per week to Marmilev and his wife.

49.  In addition, Gourmet Boutique paid an average of $3,000 per month to Budovsky's mother and step-father, Irina and Anatoly Belanchuk.   The Belanchuks performed virtually no work for Gourmet Boutique in exchange for these payments, yet were paid significantly more than Gourmet Boutique's actual employees.

## THE PURCHASE OF THE MR. CONEY ISLAND MAJORITY
## INTEREST WITH THE PROCEEDS OF LIBERTY RESERVE

50.  Since at least on or about October 12, 2011, Marmilev has owned a 51% interest in Mr. Coney Island LLC. (the "Mr. Coney Island Majority Interest").   On or about October 12, 2011, Mr. Coney Island LLC and 1215 Surf Ave. Restaurant Corp. d/b/a "Grimaldi's" entered into a joint venture agreement to renovate the premises of 1215 Surf Avenue, Brooklyn, New York (the "premises") and thereafter to operate a pizza restaurant on the premises.   According to the agreement, Mr. Coney Island LLC was to pay the expenses of renovating

the premises in exchange for a 40% share in the net profits of the pizza restaurant.

51. In November 2011, a wire transfer in the amount of $340,000 was made from the Technocash Accounts to a bank account in the United States in the name of Mr. Bleeker LLC, a shell company controlled by Marmilev. Soon thereafter, Marmilev transferred $334,800 from the account of Mr. Bleeker LLC to a U.S. bank account in the name of Mr. Coney Island LLC, which was subsequently paid to the landlord of the premises and to contractors performing renovations of the premises. Upon information and belief, Mr. Coney Island owns a 40% interest in the net profits of the Grimaldi's Pizzeria located at 1215 Surf Avenue.

## MARMILEV'S SHAM TRANSFERS OF THE DEFENDANTS IN REM

52. On January 13, 2012, Customs and Border Protection (CBP) and Homeland Security Investigations (HSI) agents conducted an inbound border inspection of Marmilev and his personal effects, including his laptop computer and other electronic devices.

53. Soon after that inspection, Marmilev conducted a sham transfer of ownership of the Defendants in Rem by "gifting" them to his aunt Yanina Izraitel. The documents were back-dated to show 2011 execution dates, even though the metadata for the transfer documents indicates the agreements were created in 2012.

54.   Marmilev has sought to hide his association with Gourmet Boutique in light of its connection to Liberty Reserve.   For example, during an outbound inspection in 2013, rather than revealing his ownership of Gourmet Boutique, Marmilev told CBP that he was an information technology "contractor" and that Gourmet Boutique was one of his "clients."

### PROBABLE CAUSE FOR FORFEITURE OF THE DEFENDANTS IN REM

55.   Budovsky, Marmilev and others, through their ownership and operation of Liberty Reserve, engaged in a money-laundering conspiracy, in violation of 18 U.S.C. § 1956.   They also operated, and conspired to operate, an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960, 371, and 2.

56.   Liberty Reserve received exchanger funds into the Technocash Accounts, which were held at Westpac Bank in Australia. Marmilev used approximately $1.6 million in funds from these accounts to purchase the Defendants in Rem.   There is probable cause to believe that the Defendants in Rem constitute property involved in a conspiracy to commit money laundering, or property traceable to such property, in violation of Title 18, United States Code, Section 1956(h), and constitute property involved in the operation of an unlicensed money transmitting business, or property traceable to such property, in violation of Title 18, United States Code, Section

21

1960.  Accordingly, the Defendants in Rem are subject to forfeiture to the United States under Title 18, United States Code, Section 981(a)(1)(A).

57.  In addition to the money laundering conspiracy charged in the Indictment, wherein Liberty Reserve provided a means for criminals to conduct illegal transactions and launder the proceeds of their crimes, Marmilev and Budovsky also laundered the proceeds that they received from Liberty Reserve through the purchase, renovation, and operation of Gourmet Boutique.  There is probable cause to believe that Gourmet Boutique constitutes property involved in a conspiracy to commit money laundering, or property traceable to such property, in violation of Title 18, United States Code, Section 1956(h).  Accordingly, Gourmet Boutique is subject to forfeiture to the United States under Title 18, United States Code, Section 981(a)(1)(A).

## FORFEITURE CLAIM
### UNDER 18 U.S.C. § 981(a)(1)(A)

58.  Paragraphs 1 through 57 of this Complaint are repeated and realleged as if fully set forth herein.

59.  Pursuant to Title 18, United States Code, Section 1956, commonly known as the "money laundering" statute, a person who:

> (a)(1) . . . knowing that the property involved
> in a financial transaction represents the
> proceeds of some form of unlawful activity,
> conducts or attempts to conduct such a financial

transaction which in fact involves the proceeds
of specified unlawful activity –

>   (A) (i) with the intent to promote the
>   carrying on of specified unlawful
>   activity; or
>
>   (ii) with intent to engage in conduct
>   constituting a violation of section
>   7201 or 7206 of the Internal Revenue
>   Code of 1986; or
>
>   (B) knowing that the transaction is
>   designed in whole or in part –
>
>   (i) to conceal or disguise the nature, the
>   location, the source, the ownership, or
>   the control of the proceeds of specified
>   unlawful activity; or
>
>   (ii) to avoid a transaction reporting
>   requirement under State or Federal
>   law,

shall be guilty of a crime.

60. Title 18, United States Code, Section 1956 further

provides, in pertinent part, that

>   (a)(2) Whoever transports, transmits, or
>   transfers, or attempts to transport, transmit,
>   or transfer a monetary instrument or funds from
>   a place in the United States to or through a
>   place outside the United States or to a place
>   in the United States from or through a place
>   outside the United States –
>
>   (B) knowing that the monetary instrument or funds
>   involved in the transportation, transmission, or
>   transfer represent the proceeds of some form of
>   unlawful activity and knowing that such
>   transportation, transmission, or transfer is
>   designed in whole or in part –

23

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

shall be guilty of a crime.

61.  18 U.S.C. § 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction [in the United States] in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."  A "monetary transaction" includes the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution."  18 U.S.C. § 1957(f)(1).

62.  Title 18, United States Code, Section 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

63.  For purposes of Sections 1956 and 1957, "specified unlawful activity" includes, among other things, mail fraud, wire fraud, identity theft, investment fraud, computer hacking, money laundering, and operation of an unlicensed money transmitting business.

64.  Pursuant to Title 18, United States Code, Section 1960, anyone who ". . . knowingly conducts, controls, manages,

24

supervises, directs, or owns all or part of an unlicensed money transmitting business" shall be guilty of a crime.

65. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956, 1957 or 1960 of [Title 18], or any property traceable to such property," is subject to forfeiture to the Government.

66. The Defendants in Rem constitute property involved in, or traceable to property involved in, money laundering transactions and attempted money laundering transactions, in violation of Sections 1956 and 1957, as well as property involved in, or traceable to property involved in, the operation of an unlicensed money transmitting business, in violation of Section 1960, and therefore are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## REQUEST FOR RELIEF

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants in Rem and that all persons having an interest in the Defendants in Rem be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants in Rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: December 12, 2014
       New York, New York

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
CHRISTINE I. MAGDO
Assistant United States Attorney
One Saint Andrew's Plaza
New York, New York 10007
Tel.: (212) 637-2297

26

## VERIFICATION

STATE OF NEW YORK    )
COUNTY OF NEW YORK   )
SOUTHERN DISTRICT OF NEW YORK)

JEREMIAH HAYNIE, being duly sworn, deposes and says that he is a Special Agent with the Internal Revenue Service – Criminal Investigations, and, as such, has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his own knowledge, information, and belief.

The sources of the deponent's information and the grounds for his belief are his personal knowledge and the official records and files of the United States Government.

Dated:   New York, New York
         December 12, 2014

_____
Jeremiah Haynie
Special Agent
IRS-CI

Sworn to before me this
12th day of December 2014

_____
Notary Public

MARCO DASILVA
Notary Public, State of New York
No. 01DA6145603
Qualified in Nassau County
My Commission Expires  May 8, 2018